IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AYYAKKANNU MANIVANNAN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 18-297 |
| | ) | Magistrate Judge Maureen P. Kelly |
| v. | ) | |
| | ) | Re: ECF No. 63 |
| U.S. DEPARTMENT OF ENERGY, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION**

**KELLY, Magistrate Judge**

Plaintiff Ayyakkanu Manivannan ("Manivannan") is a former United States Department of Energy ("DOE") employee assigned to the National Energy Technology Laboratory ("NETL") in Morgantown, West Virginia. In June 2015, DOE received a complaint from an administrator at the Pennsylvania State University concerning the alleged sexual harassment of an intern assigned to work with Manivannan. Based upon the seriousness of the allegations, DOE commenced a Management Directed Inquiry ("MDI"). The MDI led to a finding that Manivannan conducted an inappropriate sexual relationship with the intern and then stalked and otherwise physically and psychologically abused her when she tried to end the relationship. Manivannan also threatened to revoke her funded participation in the internship program if she reported his conduct. See, Ph.D, Manivannan, Ayyakkannu v. Dep't of Energy, No. PH-1221-18-0230-W-3, 2020 WL 1130149 (Mar. 4, 2020) (attached to DOE's Motion to Dismiss at ECF No. 63-1). Manivannan denies the veracity of these findings and the intern's allegations.

This action is one of several filed by Manivannan arising out of the DOE's disciplinary and removal proceedings,[1] and seeks an award of compensatory and injunctive relief against the DOE for alleged violations of the Privacy Act of 1975 ("Privacy Act"), 5 U.S.C. § 552a, during and following a concurrent state criminal investigation of his conduct. In addition, Manivannan brings negligence and intentional tort claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671 *et seq.*, for the DOE's alleged invasion of his privacy, intentional infliction of emotional distress, failure to amend personnel records, and failure to return personal property after he resigned in lieu of termination. ECF No. 59.

Presently before the Court is the Motion to Dismiss the Second Consolidated Amended Complaint filed on behalf of the DOE, ECF No. 63, raising the lack of subject matter jurisdiction over Manivannan's claims and, alternatively, for failure to state a claim upon which relief can be granted. Because jurisdiction over Manivannan's claims is precluded by the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. § 1101 *et seq.*, the Motion to Dismiss will be granted.[2]

---

[1] Manivannan is pursuing relief for alleged retaliation for whistleblowing activities under the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 111 (codified as amended at 5 U.S.C. § 1101 *et seq.*).  See, Ph.D, Manivannan, Ayyakkannu v. Dep't of Energy, 2020 WL 1130149 (Mar. 4, 2020). Manivannan has appealed the Final Decision denying relief to the United States Court of Appeals for the Federal Circuit at No. 20-1804. Manivannan also has pursued at least two actions in state and federal courts in West Virginia, and two actions in this Court, all arising out of his removal from DOE employment.

[2] Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case. ECF Nos. 58 and 62.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

   A.  **DOE Disciplinary Proceedings**

The facts underlying Manivannan's claims have been described in agency removal proceedings as follows.[3]

> Dr. Manivannan, who has PhD's in engineering and physical science, has served as a physical scientist at the Department of Energy's (DOE's) National Energy Technology Laboratory (NETL), Office of Research & Development (ORD), since approximately 2005 in Morgantown, West Virginia. In June 2015, the Pennsylvania State University (PSU) Affirmative Action Office contacted NETL manager Maryanne Alvin and told her that a former NETL intern (FB) wanted to talk about her internship with the appellant. In sum, FB reported that she and the appellant had an affair for years, and he had stalked her (including hacking her cell phone) and physically and psychologically abused her when she ended the relationship. This report ultimately led to a criminal prosecution and an internal agency investigation that resulted in a proposal to remove the appellant. [] During the internal investigation, the appellant was placed on administrative leave. []
>
> On April 8, 2016, the agency issued a proposed notice of removal to the appellant:
>
> Charge I: Improper Conduct
>
> The Management Directed Inquiry (MDI) documents the nature of your relationship with [FB]. In her sworn statement [FB] described a long-term personal and sexual relationship with you that began in the summer of 2012, shortly after she began working at NETL as your intern. In your interview for the MDI you denied having a personal or sexual relationship with [FB]. In formulating this charge I considered all of the evidence in the MDI and conducted my own credibility assessment of the evidence, including, but not limited to, your individual sworn statements to the investigator, the emails and text messages between you and [FB], as well as the photographs of you and [FB] together in a variety of settings. I

---

[3] "To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint[,] and matters of public record." Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). In addition, "a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotation marks, citation, and emphasis omitted). Because the agency proceedings and determination attached to DOE's motion to dismiss and Manivannan's state criminal proceedings and resulting Pennsylvania Superior Court opinion, Commonwealth v. Manivannan, 186 A.3d 472 (Pa. Super. 2018), are integral to his complaint, the Court may consider both.

also considered the clarity, consistency, and details provided by each of you in your sworn statements and the motives each of you may have had to exaggerate or fabricate. Given the length of your relationship, the amount of contact between you and [FB], and the general nature of some of your communications, I do not find it credible that your relationship was purely professional or that you did not have a personal or a sexual relationship with [FB].

Specification 1: Beginning in or around June 2012 through in or around December 2013, you were engaged in a sexual relationship with your intern, [FB], a student you were assigned through the ORISE program to officially mentor as part of your official duties.

Specification 2: On multiple occasions, beginning in or about June 2012 through in or about August 2012, you engaged in sexual intercourse with [FB], in your government office located at NETL in Morgantown, West Virginia.

Specification 3: You intimidated [FB], in or around December 2013, after she had returned to Morgantown over the PSU semester break to work at NETL. You did this by placing [FB] in reasonable fear of what you might do, including, but not limited to, terminating her internship, through the following actions:

1. By becoming angry when she told you that she only wanted a professional relationship with you by "not seeing you anymore" or words to that effect; and/or, 2. By calling [FB] a "f[…]ing b[..]ch" and "whore," or words to that effect; and/or,

3. Refusing to leave the apartment at which [FB] was staying in or around Morgantown, West Virginia, when [FB] had to meet with her therapist for a previously arranged Skype appointment. Instead, you demanded to stay in the room to monitor and direct what she said to her therapist by texting her responses.

Specification 4: [FB] sent you an email on or about January 31, 2014 in which she told you that her mother was ready to report your behavior towards her to someone at Human Resources at DOE and ready to contact a labor lawyer. You threatened [FB], on or about February 25, 2014 by telling her that her January 31, 2014 email to you was "with our legal people," or words to that effect, and that she might not be able to continue her internship in the summer 2014.

Specification 5: You intimidated [FB] in or about March 2013 by calling security in her presence to report she was at the NETL site in Morgantown without a badge and subsequently, as she attempted to leave NETL, you attempted to prevent her from leaving by following her from the building and blocking the exit so she could not drive her car offsite, causing her fear and/or confusion.

Specification 6: You obtained access to [FB]'s personal email account without her authorization or consent from on or about June 22, 2014, through on or about July 18, 2014.

4

Specification 7: You went to PSU to try to talk to [FB], on or about January 24, 2014. [FB] went to Hershey, Pennsylvania, for the day to avoid seeing you. She returned at approximately 12:30 AM, and went to speak to Mr. Mishra in the vicinity of his apartment. While [FB] and Mr. Mishra talked in her car, you found them, drove slowly through the permit-only parking lot in which they were parked and parked your vehicle behind the car in which she and Mr. Mishra were talking. [FB] became alarmed and drove away and you followed her for approximately 10 minutes while trying to call her on her telephone. [FB] drove to a police station and pulled over to the side of the road near the police station. You parked your vehicle behind [FB]. [FB] got out of her car and confronted you and you left.

Specification 8: You slapped [FB] on the face, and kicked her after she fell to the floor, in or around December 2013, at an apartment where she was staying in or around Morgantown, West Virginia.

CHARGE II: MISUSE OF POSITION

You are a Research General Engineer, GS-801-13 employed by NETL. A portion of your duties include serving as a mentor to students under the ORISE program. As such, your official duties included scientific and engineering research and mentoring and participating in the educational experience of a student intern. The MDI documents that you were assigned as [FB]'s mentor and that you had frequent interaction with her personally, in and out of the lab, and by email, text, and telephone conversations. In her sworn statement [FB] described a long-term personal and sexual relationship with you that began in the summer of 2012, shortly after she began working at NETL as your intern and continuing until, at least, December 2013. In your interview for the MDI you denied having a personal or sexual relationship with [FB]. You both agree that there existed a professional relationship between you that began because [FB] was assigned as your intern as a part of your official duties. [FB], however, discussed a number of occasions upon which your interactions with her were inappropriate in your role as a federal employee and/or ORISE mentor. In formulating this charge I considered all of the evidence in the MDI and conducted my own credibility assessment of the evidence, including, but not limited to, your individual sworn statements to the investigator, the emails and text messages between you and [FB], as well as photographs of you and [FB] together in a variety of settings. I also considered the clarity, consistency, and details provided by each of you in your sworn statements and the motives each of you may have had to exaggerate or fabricate. Given the length of your relationship, the amount of contact between you, and the general nature of some of your communications, I do not find it credible that your relationship was only professional or that you did not have a sexual relationship with [FB].

Specification 1: You misused your position as a Research General Engineer and/or an ORISE mentor at NETL, beginning in or around June 2012 through in or around

December 2013, when you had a sexual relationship with your intern and thereby used your position to gain a benefit for yourself.

Specification 2: You misused your position as a Research General Engineer and/or ORISE mentor at NEIL, in or around December 2013, by compelling [FB] to perform actions that were beyond your authority as her mentor and unrelated to her internship, including, but not limited to:

1.   unlocking her personal mobile telephone so that you could read her emails and other personal information contained on the telephone; and/or,

2. deleting contact information from her personal telephone pertaining to Mr. Mishra.

Specification 3: You misused your position as a Research General Engineer and/or ORISE an Mentor at NETL, in or around February and/or March 2014 by inducing Professor Donghai Wang, a person with whom you had a professional relationship due in part to your employment at NETL, to facilitate contact with [FB]. [FB] was working in Dr. Wang's lab and you used your prior association with Dr. Wang to make contact with her. You did this by, including, but not limited to:

1. borrowing Professor Wang's cellular telephone to place a call to [FB] so that she would answer because the number that was calling her would be displayed on [FB]'s telephone would be that of Professor Wang rather than your number; and/or

2. using your association with Professor Wang as an excuse to visit his laboratory in order to see [FB].

Specification 4: You misused your position as a Research General Engineer and/or an ORISE Mentor at NETL during a course of conduct from in or around May 2012 through in or around July 2014 by communicating with [FB] by telephone, email and text messages, often multiple times a day and/or late at night, about subjects not related to your role as her mentor and that, on some occasions, she found bothersome, inconvenient, and/or stressful.

Specification 5: You misused your position as a Research General Engineer and/or an ORISE Mentor at NETL by requesting that Mr. Daniel Haynes, a NETL employee and your colleague, speak with [FB] to discourage her from pursuing a relationship with Mr. Parth Mishra by telling her that Mr. Mishra was using her and had no interest in marrying her. Mr. Haynes subsequently did have a conversation with [FB] to this general effect.

Manivannan v. Dep't of Energy, 2020 WL 1130149. The DOE also charged Manivannan with Failure to Follow Procedures and Lack of Candor. Id.

Manivannan appealed the notice of removal to the Merit Systems Protection Board ("MSPB") and alleged, *inter alia*, that the MDI, his proposed removal, and the agency's cooperation with the District Attorney relative to criminal charges arising out of his misconduct all constitute unlawful retaliation for protected whistleblowing disclosures. Id.  After a three-day hearing, the Administrative Judge determined that Manivannan's disclosures were not contributing factors to the DOE conduct investigation, any complained of personnel actions, or Manivannan's recommended removal from employment. While the Administrative Judge did not find the DOE's cooperation with the Centre County prosecutor's office qualified as a "personnel action", id. *n.* 7, this conduct was included in Manivannan's workplace retaliation claim. Manivannan's appeal of the denial of corrective action is pending before the United States Court of Appeals for the Federal Circuit, No. 20-1804.

### B.  State Criminal Proceedings

Concurrent with the DOE investigation, the intern contacted the Pennsylvania State University Police to complain that Manivannan was "repeatedly contacting [her] daily by phone call, text message, email, and Skype," and had followed her in his car on at least one occasion. Comm. v. Manivannan, 186 A.3d at 476. The intern reported "that from June 22, 2014, to July 18, 2014, her [email] account was accessed twenty-one times from thirteen different Internet Protocol ("IP") addresses located [throughout the United States] …. Of note, [the intern's] email account was accessed five times from [an IP address in Morgantown, WV and in Los Angeles, CA]." Id. at 477.  The intern's companion sent screen shots of the identified IP addresses to the assigned Pennsylvania State University police officer, who traced the internet provider in each case through

7

the website Geektools.com. The police officer obtained and served "particularized subpoenas" on the providers. Comcast responded with a form letter that identified Manivannan as the subscriber connected to an IP address involved in five separate instances of unauthorized access to the intern's email account. Each was traced to Manivannan's Morgantown address and formed the basis for five state unlawful use of computer charges filed against Manivannan in Centre County. Id. During the trial on these charges, the jury also heard evidence based on DOE travel receipts that four attempts to access the intern's account from IP addresses in Los Angeles corresponded to dates when Manivannan was there on DOE business. Manivannan was also charged with one count of harassment. Id.  A jury convicted Manivannan of each of the five computer charges and harassment and he was sentenced to a period of probation. Comm. v. Manivannan, 186 A.3d at 475.

Manivannan appealed the judgment of sentence and the Pennsylvania Superior Court found that it was "constrained to agree" that the trial court abused its discretion in permitting lay, rather than expert, testimony to introduce the evidence connecting an internet service provider to an IP address, and then to an approximate "real world location" that coincided with Manivannan's Morgantown address.  The Superior Court concluded that the absence of expert testimony resulted in prejudicial error and so vacated the convictions and remanded the case for a new trial.  Id. The criminal record after remand is unavailable to the Court but agency proceedings reveal that "the prosecutor elected not to go forward with the new trial." Manivannan v. Dep't of Energy, 2020 WL 1130149.

C. Related Litigation

Beyond requesting corrective action for agency conduct in accordance with CSRA procedures, Manivannan filed at least two lawsuits in state and federal courts in West Virginia

8

seeking information concerning DOE communications with the Centre County District Attorney's Office and recovery of personal property. *See*, *e.g.*, Manivannan v. U.S. Dep't of Energy, No. 1:17-cv-192 (N.D. W. Va. Sept. 30, 2019). Manivannan's appeal of the district court's entry of judgment against him is pending in the United States Court of Appeals for the Fourth Circuit, No. 19-2188.

### D. Consolidated Second Amended Complaint

Along with his administrative and West Virginia litigation, Manivannan commenced this lawsuit alleging that a DOE Attorney-Advisor violated his rights under the Privacy Act. In particular, Manivannan alleges that the agency unlawfully disclosed to the assigned prosecutor the existence of business records related to travel and leave dates and then produced a copy of those records and the DOE's report of its internal investigation. ECF No. 1. On July 11, 2019, Manivannan filed a second lawsuit against the DOE in this Court, alleging claims for conversion of his personal property (Count I), negligence in conducting the internal investigation that led to Manivannan's removal for improper conduct with an intern (Count II), and negligence for improper communication with the Centre County District Attorney's Office (Count III). Manivannan v. United States, No. 19-828 (W.D. Pa. July 11, 2019), ECF No. 1.

The Court granted the DOE's unopposed motion to consolidate the two lawsuits and Manivannan filed a Consolidated Second Amended Complaint ("the Complaint"). ECF No. 59. In the Complaint, Manivannan alleges seven claims:

(1) Count I – Violation of the Privacy Act by disclosing the MDI report, time, and attendance records, travel records and DOE emails to the Centre County District Attorney's Office and by providing a witness to testify at Manivannan's criminal trial;

(2) Count II – Violation of the Privacy Act by failing to maintain complete and accurate SF-50 and investigatory records;

(3) Count III – an FTCA claim for conversion of Plaintiff's personal property;

9

(4) Count IV – an FTCA claim for negligence committed in conducting the internal investigation;

(5) Count V – an FTCA claim for negligence in the maintenance of personnel records;

(6) Count VI – an FTCA claim for invasion of privacy based on the investigation of Manivannan's sexual misconduct;

(7) Count VII – an FTCA claim for intentional infliction of emotional distress related to disclosing records in violation of the Privacy Act and pursuing a criminal prosecution related to the intern's allegations.

Id. The DOE has responded to the Complaint with the pending Motion to Dismiss and contends that pursuant to the CSRA, the Court lacks jurisdiction over Manivannan's claims and, in the alternative, that Manivannan's FTCA claims are time-barred. ECF No. 64 at 13, 20 and 22. Manivannan has filed his brief in opposition, ECF No. 71, and the DOE has replied, ECF No. 72. The Motion to Dismiss is now ripe for consideration.

## II.   STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the subject-matter jurisdiction of the court to address the merits of a plaintiff's suit. Fed. R. Civ. P. 12(b)(1). Under Rule 12(b)(1), "a court must grant a motion to dismiss if it lacks subject-matter jurisdiction to hear a claim." In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012); see Fed. R. Civ. P. 12(h)(3).

The first step in analyzing jurisdictional challenges under a Rule 12(b)(1) motion to dismiss is to determine whether the "motion presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed." Constitution Party of Pa. v. Aichele, 757 F.3d 347, 357–58 (3d Cir. 2014) (quoting In re Schering Plough, 678 F.3d at 243). "A facial 12(b)(1) challenge, which attacks the complaint on its face without contesting its alleged facts, is like a 12(b)(6) motion in requiring the court to 'consider the allegations of the

10

complaint as true.'" Hartig Drug Co. Inc. v. Senju Pharm. Co., 836 F.3d 261, 268 (3d Cir. 2016) (quoting Petruska v. Gannon Univ., 462 F.3d 294, 302 n.3 (3d Cir. 2006)). "But a factual 12(b)(1) challenge attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts." Id. (citing Constitution Party of Pa., 757 F.3d at 358).

"When considering a factual challenge, 'the plaintiff [has] the burden of proof that jurisdiction does in fact exist,' the court 'is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case,' and 'no presumptive truthfulness attaches to [the] plaintiff's allegations....'" Id. (quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)). Additionally, under a factual challenge, "a court may weigh and consider evidence outside the pleadings." Id. (quoting Constitution Party of Pa., 757 F.3d at 358). Thus, "a 12(b)(1) factual challenge strips the plaintiff of the protections and factual deference provided under 12(b)(6) review." Id. (citing Davis v. Wells Fargo, 824 F.3d 333, 348–50 (3d Cir. 2016)).

When assessing the sufficiency of a complaint pursuant to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all material allegations in the complaint and all reasonable factual inferences must be viewed in the light most favorable to the plaintiff. Odd v. Malone, 538 F.3d 202, 205 (3d Cir. 2008). While a complaint does not need detailed factual allegations to survive the motion to dismiss, a complaint must provide more than labels and conclusions. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." Id. (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level" and sufficient "to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 555, 570.

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.... Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557).

In other words, at the motion to dismiss stage, a plaintiff is required to make "a showing' rather than a blanket assertion of an entitlement to relief." Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008). "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'" Id. at 234 (quoting Twombly, 550 U.S. at 556 n. 3).

To determine the sufficiency of a complaint, "a court ... must take three steps," that include (1) taking note of the elements a plaintiff must plead to state a claim; (2) identifying allegations that are merely legal conclusions "because they ... are not entitled to the assumption of truth;" and (3) assuming the veracity of all well-pleaded factual allegations and determining "whether they plausibly give rise to an entitlement to relief." Connelly v. Lane Constr. Corp., 809 F.3d 780, 787 (3d Cir. 2016) (quoting Iqbal, 556 U.S. at 675, 679). If the court finds, even after construing the complaint in the light most favorable to the plaintiff, that the plaintiff is not entitled to relief, the court can dismiss the claim. Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).

### III. DISCUSSION

In an apparent facial challenge to this Court's jurisdiction, the DOE contends that Manivannan's claims implicate agency actions taken in the course of and related to his employment and thus must be remediated, if at all, through the exclusive administrative and

judicial procedures set forth in the CSRA. ECF No. 64 at 13. Further, the DOE argues that because the CSRA deprives the Court of subject matter jurisdiction, dismissal is warranted. Manivannan responds that the CSRA does not apply because the alleged Privacy Act violations are subject to a separate statutory remedy and are not otherwise included in CSRA's itemized list of "personnel actions" for which resort to judicial process is foreclosed. ECF No. 71 at 9-19. Upon review, the Court is compelled to agree that under established precedent, regardless of the existence of separate remedies under the Privacy Act or under common law as to his tort claims, Manivannan's claims arise *because of* his DOE employment and thus must be pursued though the CSRA review process.

The CSRA "established a comprehensive system for reviewing personnel action taken against federal employees." United States v. Fausto, 484 U.S. 439, 455 (1988). In enacting the CSRA, Congress "'overhauled the civil service system,' Lindahl v. OPM, 470 U.S. 768, 773 [] (1985), creating an elaborate 'new framework for evaluating adverse personnel actions against [federal employees],' id., at 774 []. It prescribes in great detail the protections and remedies applicable to such action, including the availability of administrative and judicial review." Fausto, 484 U.S. at 443. By enacting the CSRA, "[Congress] replaced the patchwork system with an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." Id. at 445 (citing S. Rep. No. 95–969, at 4). "Three main sections of the CSRA govern personnel action taken against members of the civil service." Id. Two are relevant here. As summarized by the United States Supreme Court in Fausto,

> the CSRA establishes the principles of the merit system of employment, § 2301, and forbids an agency to engage in certain "prohibited personnel practices," including unlawful discrimination, coercion of political activity, nepotism, and reprisal against so-called whistleblowers. § 2302. Nonpreference excepted service employees who are not in positions of a confidential or policymaking nature are protected by this chapter, § 2302(a)(2)(B), and are given the right to file charges of

13

> "prohibited personnel practices" with the Office of Special Counsel of the MSPB, whose responsibility it is to investigate the charges and, where appropriate, to seek remedial action from the agency and the MSPB. § 1206.
>
> Chapter 75 of the Act governs adverse action taken against employees for the "efficiency of the service," which includes action of the type taken here, based on misconduct. Subchapter I governs minor adverse action (suspension for 14 days or less), §§ 7501–7504, and Subchapter II governs major adverse action (removal, suspension for more than 14 days, reduction in grade or pay, or furlough for 30 days or less), §§ 7511–7514. In each subchapter, covered employees are given procedural protections similar to those contained in Chapter 43, §§ 7503(b), 7513(b), and in Subchapter II covered employees are accorded administrative review by the MSPB, followed by judicial review in the Federal Circuit. §§ 7513(d), 7703.

Fausto, 484 U.S. at 446–47. In accordance with these provisions, Manivannan's MSPB administrative challenge characterizes the DOE's investigation, disclosure of employment records, and removal proceedings as retaliation for protected whistleblowing activities within 5 U.S.C. § 2302(b)(8). Manivannan, v. Dep't of Energy, 2020 WL 1130149. In addition, it is beyond dispute that the DOE's investigation and misconduct resolution, including its disclosures to law enforcement officials relative to Manivannan's workplace criminal conduct, implicate actions taken in the course of disciplinary and removal proceedings. Therefore, the applicability of the CSRA and the administrative and judicial processes set forth therein to Manivannan's current claims is evident.

Manivannan argues, however, that this Court has jurisdiction because his Privacy Act claims do not seek work-related damages such as back pay or reinstatement or other remedies available under the CSRA. ECF No. 71 at 4. Rather, because Congress created a distinct statutory remedy when it enacted the Privacy Act and with it, the right to seek enforcement in federal court, the CSRA does not preclude jurisdiction.

In Fausto, a federal employee similarly sought to circumvent the CSRA and argued that statutory rights under the Back-Pay Act were separate from the CSRA and thus properly

14

adjudicated in the Court of Federal Claims.  The United States Supreme Court rejected this argument and held that the comprehensive design of the CSRA reflected "a congressional judgment that [nonpreference excepted service employees] should not be able to demand judicial review for the type of personnel action covered by that chapter." Id. at 448.  Thus, because the alleged violation of the Back-Pay Act occurred in the course of plaintiff's employment, he was required to pursue relief through the CSRA process.   Here, as in Fausto, Manivannan's claims arose as a result of and in the course of his DOE employment.  Accordingly, Manivannan must pursue any alleged Privacy Act or tort-based remedy through the CSRA process, with judicial review afforded in the United States Court of Appeals for the Federal Circuit.

To that end, the administrative process remains appropriate despite the MSPB administrative judge's conclusion that the MSPB lacked the authority to resolve Privacy Act claims.  The United States Supreme Court held that direct judicial relief remains available through the CSRA despite the MSPB's inability to resolve a disputed claim.  In Elgin v. Department of Treasury, 567 U.S. 1 (2012), plaintiff was terminated for failing to register with the Selective Service and sought to challenge the constitutionality of the Selective Service law. The MSPB dismissed the claim, concluding it did not have jurisdiction to rule on challenges to the constitutionality of a federal statute. Elgin did not appeal this ruling to the Federal Circuit but filed suit in federal district court.  The district court held that the suit was properly before it but, on appeal, the First Circuit vacated the judgment and directed that the action be dismissed for lack of jurisdiction. The Supreme Court affirmed dismissal on jurisdictional grounds and held that direct judicial review was not available simply because the MSPB determined it was not the appropriate forum for Elgin's claim.   In such instances "the CSRA does not foreclose all judicial review of petitioners' constitutional claims, but merely directs that judicial review shall occur in the Federal

15

Circuit," which "is fully capable of providing meaningful review of petitioners' claims." Id. at 10. As applied here, the MSPB's conclusion that it could not resolve a Privacy Act claim arising out of the DOE's cooperation with the criminal investigation does not permit avoidance of the required administrative process. As observed by the Court in Elgin, the factual record supporting such claims may be compiled in MSPB proceedings and then, as required by the CSRA, a full adjudication of Manivannan's rights under the Act may occur in the Federal Circuit.

Finally, Manivannan argues that his Privacy Act and FTCA claims are not within the scope of personnel actions subject to the CSRA because of the nature and timing of the DOE's alleged misconduct. Given the obvious connection to workplace criminal conduct and disciplinary proceedings, as well Manivannan's characterization of his claims as seeking relief for retaliation in MSPB proceedings, this argument is not persuasive. In Yu v. U.S. Dep't of Veterans Affairs, 528 F. App'x 181 (3d Cir. 2013), the plaintiff similarly argued that Privacy Act violations and the confiscation and destruction of property after his termination were not within the scope of the CSRA based on the nature and timing of the challenged conduct. The United States Court of Appeals for the Third Circuit affirmed this Court's dismissal for lack of subject matter jurisdiction based upon the scope of the CSRA and the relationship between the plaintiff's claims and his employment:

> [The CSRA] provides an exclusive method for federal civil servants to obtain damages for personnel decisions that violate statutory, regulatory, or constitutional rights. See Bush v. Lucas, 462 U.S. 367, 388, 103 S. Ct. 2404, 76 L. Ed. 2d 648 (1983); Sarullo v. U.S. Postal Serv., 352 F.3d 789, 795 (3d Cir. 2003) (holding that a Bivens damages claim was foreclosed by the Act because it "provides the full scheme of remedies available" to civil servants for actions "arising out of the employment context"); Filebark v. U.S. Dep't of Transp., 555 F.3d 1009, 1010 (D.C. Cir. 2009) ("[W]e have held that [the Civil Service Reform Act's] comprehensive employment scheme preempts judicial review under the more general APA even when that scheme provides no judicial relief—that is, what you get under the CSRA is what you get." (citation and quotation marks omitted)); Kleiman v. Dep't of Energy, 956 F.2d 335, 337–38 (D.C.Cir.1992) ("This court has

> refused to allow the exhaustive remedial scheme of the CSRA to be impermissibly frustrated ... by granting litigants, under the aegis of the Privacy Act or otherwise, district court review of personnel decisions judicially unreviewable under the CSRA." (citations and quotation marks omitted)).

Id. at 184. The Third Circuit determined that the alleged misconduct fell within the CSRA's jurisdiction for personnel actions, which includes action taken in the course of disciplinary or corrective actions, as well as conduct that results in significant changes in working conditions. Id. In addition, "[t]he VA's subsequent decision to retain possession of the equipment and funds and to destroy the samples obtained by Yu are also personnel decisions because they centrally relate to Yu's employment relationship with the VA. In other words, 'the violations complained of … occurred only as a result of the employment relationship.' Lombardi [v. Small Business Admin., No. 88-1718, 889 F.2d 959 (10th Cir. 1989)] – and, more particularly, occurred only as a result of the specific personnel decision made." Id. at 184-85.

The Court agrees that Manivannan's claims arose because of and during his employment relationship with the DOE and thus must be resolved within the exclusive CSRA process. Pursuant to the CSRA, judicial review, if any, for Manivannan's statutory and FTCA claims is available in the United States Court of Appeals for the Federal Circuit and this Court lacks subject matter jurisdiction. In light of this disposition, the Court does not reach DOE's alternate grounds for dismissal related to the statute of limitations and the sufficiency of Manivannan's claims for relief.

## IV. CONCLUSION

For the reasons set forth herein, Defendant DOE's Motion to Dismiss for lack of subject matter jurisdiction and pursuant to Rule 12(b)(1), ECF No. 63, is properly granted. An appropriate Order granting the Motion to Dismiss for Lack of Jurisdiction will be entered.


                                    */s/ Maureen P. Kelly*
                                    MAUREEN P. KELLY
                                    UNITED STATES MAGISTRATE JUDGE


Dated: October 7, 2020


cc:    All counsel of record by Notice of Electronic Filing