IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AYYAKKANNU ManiVANNAN,<br><br>               Plaintiff,<br>v.<br>U.S. DEPARTMENT OF ENERGY,<br><br>               Defendant. | Civil Action No. 18-297<br><br>Magistrate Judge Maureen P. Kelly |
| AYYAKKANNU MANIVANNAN,<br><br>               Plaintiff,<br>v.<br>THE UNITED STATES OF AMERICA,<br><br>               Defendant. | Civil Action No. 19-828<br><br>Magistrate Judge Maureen P. Kelly |

**PLAINTIFF'S SUR-REPLY BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

John J. Powell
MONTGOMERY MCCRACKEN
WALKER & RHOADS LLP
1735 Market Street
Philadelphia, PA 19103
(215) 772-7298
jpowell@mmwr.com

*Counsel for Ayyakkannu Manivannan*

"Where an agency compiles information about individuals for investigatory purposes, Privacy Act concerns *are at their zenith*, and if there is evidence of even a few retrievals of information keyed to personal identifiers, it may well be the case that the agency is maintaining a system of records." *Maydak v. U.S.*, 363 F.3d 512, 515 (D.C. Cir. 2004). Thus, as explained fully in *Bartel v. FAA*, when an agency conducts an internal investigation of an employee and that investigation makes a putative finding of misconduct, and, then, before the agency completes any termination or disciplinary proceeding that may arise from the investigation's findings, someone involved in that investigation calls a third party and discloses or describes that investigation, its findings, or contents from its "record of investigation" ("ROI"), the agency cannot prevail at summary judgment—even where (*unlike here*) there is no other record evidence that the person who made the disclosure actually read or retrieved the records. *Bartel v. FAA*, 725 F.2d 1403, 1409-11 (D.C. Cir. 1984). Defendants here *admit* doing this.[1]

Defendants admit that: "On June 30, 2015, the agency engaged Marisa Williams to conduct an [MDI] into Manivannan." (ECF 123 ¶ 6.) After "approximately June 2015, Hunzeker's job duties included involvement with the agency's investigation" (ECF 100 ¶ 121). The MDI "resulted in an Investigation and Report dated January 8, 2016" (ECF 123 ¶ 8), with an ROI of about "1,500 pages" (ECF 126 2; 128-7 3 (citing ROI 1, 1538)), and a cover that states: "**CONFIDENTIAL – PRIVACY ACT MATERIAL**" (ECF 128-7) (emphasis in original). They admit Hunzeker "read the MDI" (ECF 128-3 Tr. 217:22-23) before he "contacted McGoron."

---

[1] This court has repeatedly recognized that admissions in an answer can preclude summary judgment even when evidence contrary to the admission is submitted in support of such motion. *See TDY Industries, Inc. v. Natl. Freight Transp.*, Inc., 2009 WL 691947, at *15 (W.D. Pa. Mar. 12, 2009) (citing *Wilczynski v. Kuhns,* 2006 WL 2645144, at * 15 (W. D. Pa. Sept. 14, 2006) (citing *Missouri Housing Development Comm'n v. Brice,* 919 F.2d 1306 (8th Cir.1990); *Keller v. United States,* 58 F.3d 1194, 1198–99 n.8 (7th Cir. 1995)).

ECF 100 ¶ 39. They admit that Hunzeker then "*called [ADA] McGoron regarding the Plaintiff*" (ECF 10 ¶ 14), "*discussed Plaintiff's investigation with McGoron*" (id. ¶ 15), "*told McGoron*" about "*documents*" "*NETL's investigation included*" (ECF 100 ¶ 56), and "*described to McGoron*" "*DOE records*" (ECF 59 & 100 ¶ 58).  Then "Officer Meyer called Mr. Hunzeker to discuss the DOE records he had previously described to McGoron.." *Id*. Defendants admit that Meyer kept a police report, including one of that call. *Id*. ¶¶ 54, 58, 112. Defendants do not deny that it states:

> I contacted Hunzeker at the number he had provided … he had conducted an internal investigation on Manivannan . . . he believes he has travel documents that may verify the unauthorized use of Beck's email. . . . he has documentation to show that Manivannan was in California during June 30, 2014 to July 5, 2014. . . . he also has it documented that the time that Beck's email was accessed in Texas and Louisiana that Manivannan was on documented leave. . . . Manivannan's coworker unknown name, was going to be testifying on the Manivannan's behalf.

ECF 100 ¶¶ 57, 58; ECF 59 ¶ 58; *see also* Px1 (1/29/16 police report).[2] Hunzeker then sent Meyer a follow-up email that—despite attaching DOE's *Touhy* regulations, 10 CFR Part 202 Subpt. B (broadly forbidding disclosures in response to subpoenas)—Hunzeker "advis[ed]" Meyer to subpoena DOE for "'*agency records … reflecting any official travel and/or other time and attendance data.*'" ECF 59 & 100 ¶¶ 59-60; ECF 115-2 at 139.[3]

This invitation initially drew a search warrant, which Defendants refused to recognize. *Id*. ¶ 61-62.  They admit that Hunzeker sent a Feb. 11 email to McGoron conveying that refusal. That email notes that Hunzeker's boss "checked with our litigation division in DC" who advised

---

[2] Plaintiff is submitting a short proposed supplemental appendix and motion for leave to file shortly to follow this sur-reply.

[3] Every page of these time and attendance records ("ATAAPS reports") states that it is "SUBJECT TO THE PRIVACY ACT OF 1974." DX J, ECF 128-11, 64-71; *see also* 128-7, 14 (citing ROI 1145); 128-11, 66 (001145), as Hunzeker must have known from reviewing the MDI (ECF 128-3 Tr. 217:22-23).

not to recognize the search warrant.  *Id.* ¶ 63; see also Px2.  Hunzeker explained that refusal in part as follows: "***from my perspective, what makes it problematic is that<u> we are talking about otherwise innocuous government records</u> that are <u>contained in a system of government records</u>. They are not, per se, evidence of a crime or contraband, or anything like that***."  *Id.* ¶ 63; Px2 (2/11/16 email).[4]

Nevertheless, Defendants admit they thereafter "provided instructions and guidance" to the prosecutors "***regarding the contents and form of the subpoena***" (ECF 1 & 10 ¶ 21), which McGoron emailed to Hunzeker on 3/10/16, which included the text proposed by Hunzeker on 1/28, and which, on its face, not signed by a judge. ECF 128-8.  (Indeed, it not signed at all.  It is a photocopy of a form.)  Defendants admit that, upon receiving the subpoena, "***Hunzeker gathered information that he perceived to be responsive***." ECF 10 ¶ 23. He admits some documents were collected from the "**CONFIDENTIAL – PRIVACY ACT MATERIAL**" in the MDI. Px3 Supp. Hunzeker Tr. 129:16-18 (supp. to Dx C, ECF 128-3), and has described others as coming from agency "systems," including two "agency database/program[s]" and "email from agency IT systems" (ECF 59 & 100 ¶ 76, ¶ 67); *see also* Px4 (3/25/16 email).  On March 16, 2016, Defendants "sent McGoron" (a) a cover letter stating that the subpoena is ineffective (ECF 100 ¶ 82), (b) a certification signed by NETL Deputy COO Michael Monahan (ECF 10 ¶ 25; ECF 1-3 (Monahan Cert.); *see also* 100 ¶ 73; Px5 (copy of 3/14/16 email)),[5] and (c) no fewer than 411

---

[4] A genuine issue of material fact exists as to whether Detwiler received and disregarded the same advice (not to disclose) again on 3/14/16. ECF 59 & 100 ¶ 74 (redacted Skubel email). There is no reason under the Privacy Act that documents that could not be produced under a routine use in response to a search warrant could be disclosed under an invalid state subpoena, nor any good reasons for the agency to waive the privilege as to Detwiler's email to Skubel and yet attempt to assert privilege over Skubel's response.

[5] The agency did not produce a copy of this production in discovery and contends it does not have one.  Although they admit producing more than 400 hundred pages (Plaintiff contends it was approximately 1,500) of sensitive agency records, some stating "PRIVACY ACT" on their face, in

(and as many as 1,500 pages) of "*documents related to Plaintiff*" (ECF 100 ¶ 82; 10 ¶ 24).[6] Defendants contend admit that *no one at NETL kept* a paper or electronic copy of the agency's 3/16/16 production of agency records to McGoron. Ann Guy—NETL's Privacy Act officer of nearly 40 years—testified that NETL always keeps a copy of what it sends out, could not recall any other instance in which NETL failed to retain a copy of an outgoing production, and testified that NETL's Office Manager Sarah Cratsley was "upset" about the failure to do so here. ECF 115-2 Tr. 14:18-22, 68:9-11, 69:8-9; *see also* Hunzeker Dep., ECF 115-2 Tr. 242:1-14.[7] Hunzeker made several additional disclosures of Privacy Act records and information between March 16 and Manivannan's trial, including, most notably, collecting a set of Concur documents regarding the LA trip from a Sarah Brokaw and producing them to McGoron shortly before trial. Px.6-8.

Defendants contend their disclosures of "**CONFIDENTIAL – PRIVACY ACT MATERIAL**" (ECF 128-7) was consistent with published routine uses for two DOE systems of records—DOE-13 (Payroll and Leave Records) and DOE-26 (Official Travel Records)—stating that a record in that systems may be disclosed "to the appropriate local, State, or Federal agency" if it "indicates a violation or potential violation of law." ECF 128-14 at 997 (list of systems); *id.* at 1012-1014 (DOE-13); *id.* at 1026-1028 (DOE-26). An agency invoking a routine use has the burden to show compatibility and publication. *Radack v. United States Dep't of Justice*, 402

---

response to what they considered a criminal subpoena (a disclosure that required formal authorization from DOE General Counsel under the Touhy regulations, 10 CFR 202.21, and triggered a 5-year "accurate accounting" obligation under the Privacy Act, 5 U.S.C. § 552a(c)), no one at NETL involved in the 3/16/16 production kept a single paper or electronic copy of what the agency sent out.
[6] Defendants Answer states they produced "

[7] Producing hundreds of pages of agency records, some with Privacy-Act warnings (ECF 128-11, 64-71), in response to a subpoena should have triggered not only the formal approval process under 10 CFR 202.21 et seq., but an "accurate accounting" of the disclosure under 5 U.S.C. § 552a(c).

F.Supp.2d 99, 104-05 (D.D.C.2005).  The routine use defense fails for two reasons.  First, the agency wrote on February 11 that it regards the documents at issue to be "otherwise innocuous records contained in a system of records" that are not per se evidence of a crime.  The fact of this admission creates at least a genuine dispute of material fact.  *Id.* ¶ 63;,

    Second, problem with this defense is that, under the plain text of the statute, 5 U.S.C. § 552a(e)(3)(C), an agency is required to give each person from whom it collects information subject to that routine use written notice of that potential use when the agency collects it, either by notice on the form used to collect the information, or on by a separate writing.  *Id.*  And to avail itself of the safe harbor of that routine use late, an agency must make adequately show that it complied with that requirement.  In other words, the Agency must show it provided Manivannan actual notice of the asserted routine uses regarding disclosure to law enforcement when it collected the information disclosed.  *See USPS v. Nat'l Ass'n of Letter Carriers*, 9 F.3d 138, 146 (D.C. Cir. 1993) (reversing summary judgment where agency below relied on general practices rather than identifying actual notice forms); *Covert v. Harrington*, 876 F.2d 751, 754-56 (9th Cir. 1989) (affirming judgment against DOE for disclosing employees' information to federal prosecutors, finding lack of actual notice of published use); *Minshew v. Donley*, 911 F. Supp. 2d 1043, 1073 (D. Nev. 2012) (agency failed to rebut argument that OPM failed to inform Plaintiff on the form that a routine use would allow disclosure to private "circumstances surrounding [plaintiff's] separation from federal employment.").

    Here, Manivannan received the opposite of "actual notice."  He received a ***Kalkines warning.***  See Px8.  As noted above, Defendants admit that Manivannan was interviewed during the MDI.  During that interview, Marissa Williams assured him three times that everything in the MDI would be and remain confidential.  The Kalkines carries use immunity, the broadest

possible protection from prosecution. Hunzeker admitted that neither he nor Williams would have ome to During that interview, Manivannan was assured that no The complaint here specifically alleges that, during her investigation, "Williams interviewed Dr. Manivannan," and, during that interview, "Defendants expressly told Plaintiff that the information Williams collected would not be used for purposes of any criminal proceeding." ECF 59 ¶ 35. Plaintiff respectfully submits that giving Manivannan a *Kalkines* warning and then both disclosing the materials accompanying the MDI and using the MDI and the agency itself as a vehicle of criminal investigation and prosecution is entirely outrageous, and, as the post-trial emails from Hunzeker in the Complaint demonstrate, was intended to cause Manivannan emotional distress.

## CONCLUSION

For the above reasons, Manivannan respectfully requests that this Court deny Defendants' motion for summary judgment. Plaintiff respectfully requests a hearing on Defendants' motion.

Respectfully submitted,

Dated:  January 19, 2024

*/s/ John J. Powell*
John J. Powell
MONTGOMERY MCCRACKEN
WALKER & RHOADS LLP
1735 Market Street
Philadelphia, PA 19103
(215) 772-7298
jpowell@mmwr.com

*Counsel for Ayyakkannu Manivannan*

.